HARVEY *v.* ELECTRIC REFRIGERATION CORPORATION.

1. LICENSES—BLUE SKY LAW—EXEMPTIONS—BURDEN OF PROOF.
   In an action against a corporation to recover the purchase price
   of corporate stock concededly sold in violation of the blue sky
   law (Act No. 220, Pub. Acts 1923) unless it fell within the
   exemption of section 5 (*g*), defendant had the burden of prov-
   ing such exemption (section 6).

2. SAME—REQUIREMENT OF STATUTE THAT RECORDS BE KEPT—PRE-
   SUMPTIONS—EVIDENCE.
   Filing in the office of the securities commission a carbon copy of
   a telegram sent in answer to a letter asking approval of a plan
   to sell stock to employees and distributing representatives of
   defendant was not a strict compliance with section 1 of the act,
   requiring the commission to "keep a complete record of all its
   meetings, its accounts and the business it transacts," and
   therefore would not carry whatever presumptions of regularity
   are borne by records made as required by law.

3. SAME—WHEN REQUIREMENTS OF STATUTE MET.
   Unless made so by statute, the lack of proper record ordinarily
   would not be conclusive or fatal; but the requirements of the
   statute would be met only by a showing sufficient to justify
   entry of an order *nunc pro tunc* approving the plan of sale
   submitted.

4. SAME—EXEMPTIONS—SALE OF INDUSTRIAL OR WELFARE STOCK—
   "SIMILAR PLAN."
   Under section 5 (*g*) of the blue sky law, exempting from its
   provisions any offering or sale of industrial or welfare stock
   or any "similar plan" of distribution to employees, as pro-
   vided for in the corporation code (Act No. 84, Pub. Acts 1921,
   pt. 2, chap. 2, subd. 5, §§ 14–17), the irreducible minimum of a
   "similar plan" is an appreciable and evident advantage to
   employees over the general public in the acquisition of stock of
   the corporation for which they are working, the advantage to
   arise out of and bear direct relationship to their employment.

5. SAME—SALE OF STOCK NOT WITHIN EXCEPTION.
   Where neither the plan of sale of corporate stock nor surrounding
   circumstances indicated any preferential benefit to employees
   which would create a similarity to an industrial or welfare

As to interpretation and effect of the "blue sky laws," see
annotation in 15 A. L. R. 262; 24 A. L. R. 523; 27 A. L. R. 1169;
30 A. L. R. 1331; 40 A. L. R. 1014.

plan as provided for in Act No. 84, Pub. Acts 1921, pt. 2, chap. 2, subd. 5, §§ 14–17, and the sale of which to the public at the price charged, which was out of proportion to its value, could not have been authorized by the utilities commission under section 12 of the blue sky law, stock so sold was not within the exception of section 5 (*g*) of said law.

6. SAME—RESCISSION—TENDER.

Where an application for stock did not create a contract until its acceptance by the corporation, and the purchaser's original subscription for 2,000 shares asked that 1,000 be issued to his wife, which she paid for personally, and the corporation accepted the subscription by way of issuance of separate certificates to the purchaser and his wife for 1,000 shares each, the purchaser's tender back of 1,000 shares with accretions was a sufficient tender to entitle him to maintain an action to recover the purchase price on the ground that the sale was in violation of the blue sky law.

7. SAME—RESCISSION—WAIVER—ESTOPPEL.

Where the purchaser's counsel wrote to the corporation's secretary asking for a copy of the original application for stock, and later for permission to look at the books, the correspondence being in the form of request and not of demand upon assertion of right, and indicating no intention of waiving rescission of the contract of purchase, there was no waiver and the purchaser is not thereby estopped from maintaining an action for the purchase price.

Error to superior court of Grand Rapids; Verdier (Leonard D.), J. Submitted January 24, 1929. (Docket No. 34, Calendar No. 33,994.) Decided March 29, 1929.

Assumpsit by Frank A. Harvey against the Electric Refrigeration Corporation and another to recover purchase price paid for corporate stock on rescission of sale. Judgment for plaintiff. Defendants bring error. Affirmed.

*MacKay, Wiley, Streeter, Smith & Tucker,* for appellants.

*Laurence W. Smith* and *Fred N. Searl,* for appellee.

FEAD, J.   This is an action to recover the purchase price paid for corporate stock on rescission of sale.   Concededly the sale was in violation of the blue sky law (Act No. 220, Pub. Acts 1923), unless it fell within the exception, § 5 (*g*):

"Any offering or sale of stock by a corporation under the laws of Michigan relating to industrial or welfare stock, or any similar plan of distribution to employees, provided such plan is submitted to and approved by the commission."

Electric Refrigeration Corporation was organized in 1925 by defendant Goss to acquire and operate, without destruction of corporate entities, Kelvinator and Nizer Corporations and Grand Rapids Refrigeration Company.   Goss had option on all the capital stock of the latter, originally expiring January 11, 1926, extended 30 days, taken up and sale closed February 12th.   The two other corporations were acquired through trade of stock.   On January 6, 1926, Mr. J. V. Oxtoby, an attorney, wrote the Michigan securities commission:

"Pursuant to your suggestion, I am also enclosing herewith draft (proof of January 4, 1926) of proposed letter to be sent by Electric Refrigeration Corporation to certain of its employees and distributing representatives and those of its three constituent companies, offering the right to subscribe to a limited number of shares of capital stock at $70 per share upon the instalment plan.   As I stated to you on December 31st, with reference to these employees' shares: Employees are to be permitted to subscribe at $70 per share upon which they will pay $10 per share as the first instalment, the remainder of the subscription price to be payable in twelve

equal monthly instalments of $5 each per share.
Accompanying this draft is a form of the subscrip-
tion blank and of the acceptance thereof. We would
like to have your approval of this letter before it is
sent out. We would like to send it out tomorrow if
possible. If the form of letter meets with your ap-
proval, we will appreciate it if you will send me a
telegram tomorrow morning giving your approval
and permitting us to send out the letter.

"We are engaged in preparing a formal applica-
tion to you for approval of the proposed exchange
of not to exceed 506,250 shares of the capital stock
of the new company in exchange, share for share,
for not to exceed 506,250 shares of the capital stock
of Kelvinator and Nizer Corporations (253,125
shares each). We are also preparing a formal ap-
plication for your approval of the employees' stock
plan. These papers we will try to have in your
hands shortly."

The letter to employees stated the instalment pur-
chase plan as outlined in Mr. Oxtoby's letter, and is
too long to be set out in full. However, it should be
noted that the plan provided that on default in pay-
ments the corporation could sell the stock, apply the
purchase price to unpaid instalments and expenses
of sale, and return the balance to the original pur-
chaser. The offer was to a "selected group" of em-
ployees and distributing representatives of defend-
ant corporation and its three constituent companies.

On January 8th the secretary of Electric Refrig-
eration Corporation received two telegrams, one
sent at 3:07 p. m., reading:

"Electric Refrigeration Corporation letters Okeh.
Stop. Preliminary filing for stock to employees re-
fused.

"Michigan Securities Commission."

The other was dispatched at 4:56 p. m., and read:

"Plan of sale of stock to employees Okeh, but stock cannot be offered to distributing representatives as they are not employees.

"MICHIGAN SECURITIES COMMISSION."

Carbon copies of these telegrams were kept in the office of the commission and were produced at the trial as part of its files.

On January 11th Mr. Oxtoby sent to the securities commission a formal application, verified by the president and secretary of the corporation, asking leave to issue not more than 506,250 shares in exchange for Kelvinator and Nizer Corporations; set up the plan to sell 50,000 shares of no par value stock, at $70 a share, to its employees and distributing representatives, under conditions set out in circular letter, subscription blank and acceptance accompanying the application; alleged:

"The 50,000 shares of its stock herein referred to are to be sold to employees and distributing representatives on the instalment plan as set forth in the accompanying letter addressed to them;"

and asked that—

"The issue and sale from time to time of not exceeding in the aggregate 50,000 shares to employees and distributing representatives on the instalment plan, as herein set forth, be accepted for filing in accordance with the provisions of the above-mentioned law."

The application contained no suggestion that the issue of stock to employees was to be under the industrial plan. "Accepted for filing" is the term used in the statute as authorizing sale of securities

to the general public. In Mr. Oxtoby's letter, enclosing the formal application, he said:

"In connection with this application you will recall * * * that you have given us your informal approval of the letter to the employees with the reservation that the stock could not be offered to distributing representatives, who are not employees."

On January 26th, the commission made and entered upon its records a formal order validating the issuance of 506,250 shares for the purpose of exchange for stock of the Kelvinator and Nizer Corporations. It made no order in connection with employees' stock. On January 27th Mr. Oxtoby forwarded to the commission the fee for the authority to exchange stock and called attention that—

"Included in the same application was the company's application for your approval of its issue of 50,000 shares to employees and distributing representatives."

The commission made no answer to this reminder, nor did it take further action on employees' stock.

Plaintiff was, and for some years had been, secretary of the Grand Rapids Refrigeration Company, and owned over 3,000 shares of its stock, which he sold to defendant corporation. He was anxious to acquire stock in defendant corporation, and on January 28th made formal application for 2,000 shares, 1,000 to be issued to himself and 1,000 to his wife. On February 12th plaintiff sent his own check for $70,000 and his wife's check, in like amount, in full payment. February 19th defendant corporation acknowledged receipt of the subscription and sent separate instalment purchase certificates to plaintiff and his wife for their respective shares. Plaintiff received dividends from time to time and additional stock on a redistribution of original subscrip-

tions at $50 per share. He said he first discovered that the sale was made in violation of the blue sky law on August 28, 1927, and on September 12, 1927, he tendered back to the defendant corporation all the stock, together with dividends he had received, with interest on dividends, and demanded the purchase price he had paid.

There was no element of fraud or overreaching in the sale to plaintiff. No equities run in his favor. He has no case except as it is found in the ordinarily beneficial provisions of the blue sky law, which he has invoked and to which he is legally entitled, whether the result be just or not.

Defendants had the burden of proof that the sale to plaintiff was within the statutory exemption (Act No. 220, Pub. Acts 1923, § 6). They contend that, while the securities commission entered on its records no formal order of approval of sales to employees by defendants, the sale to plaintiff was made in the course of distribution of industrial stock or "similar plan" within the meaning of the statute; that the second telegram of January 8th was an official approval by the commission, both of the stock as industrial or similar, and of the plan of distribution; and consequently the sale was within the exception and valid.

Section 1 of the act requires the commission to "keep a complete record of all its meetings, its accounts and the business it transacts." It is not necessary to determine what questions would be foreclosed by formal action of the commission, properly recorded. Filing a carbon copy of the telegram at bar in the office of the commission was not a strict compliance with the statute, and, therefore, would not carry whatever presumptions of regularity are borne by records made as required by law. On the

other hand, unless made so by statute, the lack of proper record ordinarily would not be conclusive nor fatal. But at least it would have the effect of requiring defendants to make a showing sufficient to justify entry of an order *nunc pro tunc, i. e.,* that their plan of distribution of stock to employees was submitted to and approved by the commission, and also that it was approved as an industrial or "similar plan" or was such plan in fact.

Two members of the commission constitute a quorum (§ 1). The chairman is given certain authority for individual action as prescribed by statute or by regulations adopted by the commission. Approval of a plan of distribution of industrial stock is not among his statutory powers and was not shown to have been conferred by regulation if, indeed, the commission had authority to grant such power. There was no showing that the securities commission, by action of a quorum, authorized the telegram upon which defendants rely, nor, except by inference from the copy being on file, was it shown that the chairman or any commissioner caused it to be sent. A *nunc pro tunc* validating order would not be justified upon the showing made.

Mr. Oxtoby's letter of January 6th was too indefinite to be fairly considered an application for approval of a plan of distribution of stock to employees. It did not designate the number of shares to be so issued nor present data from which the commission could determine the advisability of approval. His various letters, the formal application to have employees' stock "accepted for filing," and the inaction of the commission thereon, while making and recording a formal order upon the trade of stock asked for in the same application, taken together, are impressive that the telegram was in-

tended by the sender, and was understood by Mr. Oxtoby, as no more than an informal and inconclusive approval of a form of letter to be sent to employees in advance of effective application for authorization of sales. Even if the first letter could be considered a proper application, and the telegram an approval by the commission, the latter could not be regarded as more than approval of the plan as outlined in the letter, whether industrial, similar, or otherwise.

Industrial or welfare stock is provided for by the corporation code (Act No. 84, Pub. Acts 1921, pt. 2, chap. 2, subd. 5, §§ 14–17, p. 148). Many features are permissive, but the outstanding and indispensable requisites are that stock be issued to employees of the corporation; that while the plan may require that stock "may be paid for partly in cash, to be paid in from time to time, and partly in credits given for continued and faithful service to such corporation," the essential idea is that it be sold "to its employees upon consideration of such faithful or continued employment as may be fixed by the voting stockholders;" and that while the contract may contain "conditions of forfeiture for failure to fully pay for or earn such stock as may be equitable, * * * there shall be no forfeiture of any cash payments made upon such certificate." No "similar plan" is provided by statute nor disclosed by the books, law or lay. Obviously, as the law prescribes the essentials of an industrial plan, and there is no other guide, we must hold that until the legislature otherwise speaks or the elements attain common recognition, the irreducible minimum of a "similar plan" is an appreciable and evident advantage to employees over the general public in the acquisition of stock of the corporation for which they are work-

ing, the advantage to arise out of and bear direct relationship to their employment.

Neither the correspondence nor the formal application contained any suggestion that credit on purchase price of stock was to be given employees on account of service, either past or future, nor had such credit been authorized by the stockholders of defendant corporation. The contract of purchase provided a remedy on default, which permitted and could hardly fail to work forfeiture of part or all instalments paid. Nowhere in the proceedings or instruments was the nomenclature of the industrial stock plan employed. The words used and the terms of the contract stamp the plan as that of an ordinary sale for cash on instalments. It was not industrial stock within the statute.

Neither the plan itself nor the surrounding circumstances indicated any preferential benefit to employees which would create a similarity to an industrial or welfare plan. The offer was to a selected group. The price charged was out of proportion to the value of the stock as disclosed by the financial statement filed with the formal application. The commission could not have authorized sales to the public at the price (Act No. 220, Pub. Acts 1923, § 12). The plan and contract suggested no advantage to employees by way of credit for service, either on account of past employment or anticipated future faithfulness.

Other objections made to defendants' position need not be discussed. The above are determinative. Some of the individual infirmities might not be incurable under special circumstances, but in combination they are fatal. The sale was not within the exception of the statute.

Defendants further contend that plaintiff's tender was insufficient because he purchased 2,000 shares and tendered back only 1,000 shares with accretions. In the circular letter and application blank it was recited that defendant corporation reserved the right to accept all or any part of the subscriptions. The application, therefore, did not create a contract until it was accepted by defendants. Plaintiff's original subscription for 2,000 shares asked that 1,000 be issued to his wife. She afterward paid for them personally. Defendant accepted the subscription by way of issuance of separate certificates to plaintiff and his wife for 1,000 shares. This completed the contract and resulted in separate sales to each. The tender was sufficient.

After tender, plaintiff's counsel wrote the secretary of defendant corporation asking for a copy of plaintiff's original application, and later for permission to look at the books. Defendants contend that this was an assertion of a stockholder's privilege, an affirmance of sale, and constituted waiver of rescission. The correspondence was in the course of investigation by plaintiff's counsel, was in the form of a request, not of demand upon assertion of right, and indicated no intention to waive the rescission, nor did it estop plaintiff. *Edward* v. *Ioor,* 205 Mich. 617 (15 A. L. R. 256).

As plaintiff was entitled to a directed verdict as a matter of law, it is unnecessary to consider the other matters presented.

Judgment is affirmed, with costs.

NORTH, C. J., and FELLOWS, WIEST, CLARK, MC-DONALD, POTTER, and SHARPE, JJ., concurred.